**CHURCH & DWIGHT CO., INC., Appellant,**

v.

**Michael HUEY d/b/a Clear View of Texas, Appellee.**

**No. 04–96–00879–CV.**

Court of Appeals of Texas, San Antonio.

Dec. 17, 1997.

Rehearing Overruled Jan. 13, 1998.

Mark J. Cannan, Lang, Ladon, Green, Coghlan & Fisher, P.C., San Antonio, for Appellant.

Laurie A. Weiss, Fulbright & Jaworski, L.L.P., James F. Gilligan, McCarthy & Gilligan, P.C., Larry Zinn, San Antonio, for Appellee.

Before HARDBERGER, C.J., and LÓPEZ and ANGELINI, JJ.

## OPINION

HARDBERGER, Chief Justice.

A jury found that appellant, Church & Dwight Company, Inc., had violated the DTPA by making misrepresentations about its product, Armex Blast Media, to appellee, Michael Huey, who wanted to use the product to remove paint from the window frames of San Antonio's historic Travis Building. The jury awarded Huey actual damages of $9,830, additional damages under the DTPA of $50,000, and attorneys' fees. The trial judge added $2,000 in statutory penalties and reduced the additional damages to $17,660. In ten points of error, Church & Dwight claims that the verdict was legally or factually insufficient because any actions taken by the company were not taken in connection with the original purchase of the medium and that the trial court erred in admitting hearsay evidence. We affirm the judgment.

## FACTS

In 1993, Michael Huey, doing business as Clear View of Texas, won a bid to depaint and repaint the window frames of the Travis Building in San Antonio. To complete the job, Huey needed a material and method with which to remove the old paint efficiently. Huey learned of Armex, a baking soda-based product manufactured by Church & Dwight, through a chance meeting with Andrew Taylor, a representative of San Antonio-based American Graffiti, which uses Armex to remove graffiti from local buildings. Huey expressed an interest in the product, and Taylor agreed to come to the Travis Building and demonstrate Armex's paint-removing abilities. At the demonstration, Taylor gave Huey a brochure demonstrating the use of the substance at a petrochemical plant and also a flyer describing American Graffiti's services, and negotiated a price for American Graffiti to do the work. Taylor and his crew worked on the project for one day, and then the parties agreed that Huey's crew would do the work itself, renting the equipment from American Graffiti.

In September 1993, Huey discovered a problem with Armex. Although the flyer published by Church & Dwight represented that the product rinsed away easily, in fact it soaked into porous materials, such as brick,

and seeped out, leaving white stains and crystal formations. Repeated rinsing did not solve the problem. Taylor came out to the site and recommended that further rinsing be done. When this did not help, a representative of Church & Dwight came out. He recommended a detergent that, if used, would vitiate Huey's warranty on the paint he had purchased for the project. A second Church & Dwight representative recommended a vacuum process, which Huey rejected as impractical for the site.

Meanwhile, additional problems were surfacing. The substance leaked or ate its way through caulking into the building, damaging wood varnishes. It also had a corrosive effect on aluminum window frames. Huey made no further requests for assistance, and, in December 1993, Huey sued both American Graffiti and Church & Dwight for violations of the Texas Deceptive Trade–Practices Act. TEX. BUS. & COM.CODE §§ 17.41–17.63 (DTPA) (Vernon 1987 and Supp.1997). A jury found that American Graffiti had not violated the DTPA, but that Church & Dwight had—by making misrepresentations about its product and by failing to comply with a warranty.

### POINTS OF ERROR ONE–NINE: LEGAL INSUFFICIENCY

In its first nine points of error, Church & Dwight claims that jury's verdict was based on legally insufficient evidence. We disagree.

### Standard of Review

■ When reviewing a judgment for legal sufficiency, the appellate court must consider only the evidence that, when viewed in its most favorable light, supports the jury's verdict. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). All contrary evidence and inferences must be disregarded. *Id.* All that is required to uphold the verdict on legal insufficiency grounds is that there be more than a scintilla of evidence supporting the verdict. *Id.*

### Discussion

■ Church & Dwight's legal insufficiency points of error are based on a Supreme Court of Texas decision, *Amstadt v. United States Brass Corp., et al.,* 919 S.W.2d 644 (Tex.1996), which held that upstream suppliers of component parts could not be held liable under the DTPA if the claimed violations did not occur in connection with the consumer transaction that gave rise to the claim. *Amstadt,* 919 S.W.2d at 647. Church & Dwight argues that it is a manufacturer of a component part, Armex Blast Media, and thus cannot be held liable. Church & Dwight also argues that the supreme court has applied *Amstadt* broadly, to all cases where the manufacturer is not connected to the consumer transaction, and that because Church & Dwight was not connected to the transaction between Huey and American Graffiti, it cannot be liable.

We reject Church & Dwight's first claim and find that the company in this case is not a manufacturer of a component part. In *Amstadt,* the plaintiffs were homeowners who had sued the manufacturer of plumbing systems and the compounds and resins used in them when these systems failed. The supreme court examined the role that each manufacturer played in the plaintiffs' purchase of their homes. The manufacturers and suppliers of the compound and resins used in the plumbing systems had not acted in connection with the purchase of the homes, the court stated, because they exercised no control over the manufacture and installation of the finished systems or of the homes, and because there was "no evidence that the information provided to homebuilders or building code officials was intended to be or actually was passed on to consumers." *Id.* at 651. The court emphasized that the resin manufacturer's marketing efforts were not "incorporated into the efforts to market homes to the plaintiffs." *Id.*

The court noted that the manufacturer of the plumbing system, U.S. Brass, had a greater role in the consumer transaction. Its representatives had met with homebuilders and provided them with a catalog that stated that the pipes would not corrode, freeze, or experience mineral build up. However the court noted that, as with the other defendants, U.S. Brass's marketing efforts had not been intended to, nor had they

been, incorporated into the marketing of the homes. *Id.* at 652; *see also State Indus., Inc. v. Corbitt,* 925 S.W.2d 304, 311 (Tex. App.—Houston [1st Dist.] 1996, no writ) (applying *Amstadt* where homeowner sued manufacturer of new home's hot water heater).

Neither *Amstadt* nor *Corbitt* is directly analogous to this case. Church & Dwight manufactured a completed product, Armex Blast Media. This medium cannot be combined with something else to create a different product to sell to a consumer. The consumer purchases the medium. A component part of that product might be the Arm & Hammer baking soda that is used for grit. But the medium itself is the product that Huey bargained for. Church & Dwight's sole witness testified as much himself when he said the company sold the Armex Accustrip "as a process, the system cleaning and decoating system." Under Church & Dwight's reasoning, the manufacturer of a baby formula could not be held liable for selling defective powdered milk because the milk is a component part of an infant-feeding system that includes both bottle and formula.

▇ Church & Dwight contends alternatively that *Amstadt's* reasoning is not limited to cases where the manufacturer has produced a component part of a completed product, but that the case stands for the broader principle that the manufacturer in any case must be connected to the consumer transaction in order to be held liable for deceptive trade practices. We agree. The supreme court, in fact, noted in *Amstadt* that it was not making new law when it required such a connection, only solidifying an existing requirement. *Amstadt,* 919 S.W.2d at 649–50. However, we do not accept Church & Dwight's contention that it was not connected with this transaction. Church & Dwight's marketing efforts *were* incorporated into American Grafitti's marketing efforts, and they formed the basis for Huey's decision to use the product. When American Grafitti gave a demonstration of its technique to Huey, it passed along a brochure published by Church & Dwight, touting the benefits of its product. It is true that the flyer represents the product being used in a petrochemical plant, but the bro-chure makes broad representations about the product's efficacy, including, "[Armex will] clean and depaint iron, stainless steel, galvanized metal, aluminum, concrete, glass, rubber, neoprene, composite materials ... and more," and "uses water-soluble media. Clean up is faster and easier than with sand-blasting or solvents." Finally, the bags of media compound also had advertising labeling, stating, "Armex Blasting Media Maintenance Formula XL with SuperKleen Rinse Accelerator." The bags also prominently featured Church & Dwight's name and business address and a promise of environmentally friendly blasting, as well as advertisements for other Arm & Hammer products. These marketing connections go beyond those involved in *Amstadt* and provide a legal basis for holding Church & Dwight liable for any DTPA violations.

Church & Dwight cite the recent supreme court case, *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812 (Tex.1997), to demonstrate that *Amstadt* has application beyond the context of the manufacture of component parts. However, Church & Dwight's own authority illustrates the flaw in its argument. In *Arthur Andersen,* Perry Equipment Corporation sued Arthur Anderson, the accounting firm who had prepared an audit of Maloney Pipeline Systems, a company Perry wished to purchase. *Arthur Andersen,* 945 S.W.2d at 814. Perry had not, however, hired or paid the accounting firm. *Id.* at 815. Instead, the firm had been hired by the company the plaintiff was considering purchasing. *Id.* One of Arthur Anderson's claims on appeal was that, because of this remote connection between the plaintiff and the defendant, the plaintiff was not actually a consumer of the defendant's services under the DTPA. *Id.* Citing *Amstadt,* the court held that because the plaintiff had insisted on an audit and because the defendant had been hired (even though the plaintiff didn't do the hiring) to do the audit, the defendant had "sought and acquired Arthur Anderson's services." *Id.*

Clearly, Arthur Anderson wasn't present at the original transaction between Perry and Maloney Pipeline, any more than Church & Dwight was present when Huey purchased

its Armex Media from American Graffiti. However, Huey most certainly "sought and acquired" Church & Dwight's product, based, in part, on the manufacturer's representations. Further, just as in *Arthur Andersen,* Huey relied on the provider's representations to make a business decision. Church & Dwight was connected to the transaction, because Church & Dwight's medium was the *only* subject of the transaction.

A Texas Supreme Court case decided well before the passage of the DTPA is illustrative. In *United States Pipe & Foundry Co. v. City of Waco,* the city of Waco hired an independent contractor to install a water pipeline. 130 Tex. 126, 108 S.W.2d 432, 433 (1937), *cert. denied,* 302 U.S. 749, 58 S.Ct. 266, 82 L.Ed. 579. When the pipes failed, the city sued both the contractor and the manufacturer. *Id.* The court held that the manufacturer, on these facts, could be held liable, based on the representations made by the manufacturer to the city regarding the quality and fitness of the pipes. *Id.* at 434. The court stated, "Having secured the benefits [of the sale], it [the manufacturer] may not avoid the burdens of the transaction." *Id.* We believe this principle must also be applied here, where Church & Dwight's advertising reached a consumer and induced him to buy Church & Dwight's product, thus gaining for Church & Dwight the benefits of the transaction.

## POINTS OF ERROR ONE–NINE: FACTUAL INSUFFICIENCY

Alternatively, Church & Dwight claims that the evidence was factually insufficient to support the jury's finding that it had committed violations of the DTPA.

### Standard of Review

■ When reviewing a verdict for factual insufficiency, an appellate court must give great deference to the jury findings. The court reviews all the evidence, but reverses only if the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

### The Evidence

Church & Dwight claims that the evidence was factually insufficient for the jury to find that it had (1) engaged in any false, misleading, or deceptive practice, including failure to disclose or misrepresentations; (2) engaged in any unconscionable action or course of action; or 3) failed to comply with a warranty. Church & Dwight also claims there was insufficient evidence to prove that it had knowingly engaged in these practices or that any of its conduct was a producing cause of Huey's injuries. We overrule these points.

■ DTPA liability may be premised on the sufficiency of any one of the claims to which the jury answered in the affirmative. *See Redman Homes, Inc. v. Ivy,* 920 S.W.2d 664, 668 (Tex.1996) (where jury questions presented independent theories of liability under DTPA, finding warranty breach was sufficient to uphold the judgment). However, there is sufficient evidence for the jury to have answered "yes" to the two DTPA causes it addressed.

Huey presented evidence at trial showing the following:

1. Huey was given a brochure, published by Church & Dwight, that represented that Armex was an effective blasting medium on "virtually any material" and that it rinsed off easily.

2. Church & Dwight judicially admitted that it marketed its product as easy to apply and remove.

3. Church & Dwight's patent applications and judicial admissions show that Church & Dwight knew, before Huey purchased Armex, that it had a rinsing problem with a prior version of the medium, that the medium reacted with hard water to leave a film, and that the medium could penetrate caulking materials.

4. Church & Dwight failed to disclose this information to American Graffiti or to Huey.

5. Huey relied on the representations made by Church & Dwight about Armex.

6. Church & Dwight had superior knowledge about its product.

7. American Graffiti relied upon representations made by Church & Dwight in writing its own advertising brochure.

8. Armex was the exclusive media blaster used by American Graffiti, which often did work on brick, and Church & Dwight knew this.

9. Huey paid $2,719.50 to American Graffiti for the media and suffered over $10,000 in damages, attempting to repair the seepage problem.

Church & Dwight's sole witness testified that, although the company had applied for a patent on a "new and improved" variety of Armex that would not leave a white residue, it continued to market the old Armex, that it had other customers who used the product on brick with no problem, and that, generally, the product was safe on most surfaces. Church & Dwight relied also on testimony that the problems at the site were not caused by Armex, but by the cracks and crevices in the exterior of the Travis Building.

## Misrepresentations

The jury had sufficient evidence to find that Church & Dwight had made misrepresentations regarding its product and that Huey had relied on these misrepresentations.

■ The elements of a DTPA misrepresentation claim are: (1) the plaintiff is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) the acts were a producing cause of the plaintiff's injuries. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995). The misrepresentation must be of a material fact. *Milt Ferguson Motor Co. v. Zeretzke,* 827 S.W.2d 349, 355 (Tex.App.—San Antonio 1991, no writ). However, there is no requirement that the seller know of the falsity of the misrepresentations in order to be liable for them. *Pennington v. Singleton,* 606 S.W.2d 682, 689 (Tex.1980).

■ Before purchasing Armex, Huey was given information published by Church & White that the product was safe for virtually any surface and that it rinsed easily. He testified that he relied upon those representations and that they were material to his decision to use the product. Thus, the jury

had sufficient evidence to find misrepresentations.

■ Church & Dwight argues, however, that it cannot be held liable for misrepresentation, because American Graffiti was found not to be liable. According to Church & Dwight, when Huey moved for a judgment on the jury's verdict that relieved American Graffiti of liability, he was barred from collecting from Church & Dwight because the claim against Church & Dwight was derivative of the claim against American Graffiti. The authorities cited by Church & Dwight, however, do not support this contention.

In *McFaddin, Wiess & Kyle Land Co. v. Texas Rice Land Co.,* a Texas court of appeals held that collateral estoppel barred suit against one partner for claims that had already been litigated in another partner's favor. 253 S.W. 916 (Tex.Civ.App.—Beaumont 1923), *aff'd,* 265 S.W. 888 (Tex. Comm'n App., 1924, judgm't adopted). The court noted an exception to the rule allowing plaintiffs to sue joint tortfeasors or trespassers—litigants will be barred where "the immediate actor, or active wrongdoer, has been sued and a judgment has been rendered in his favor." The court noted that this exception exists to promote justice by denying a recovery against one person for the bad acts of another, when the latter has been held blameless. *Id.*

We do not believe this principle is applicable to the case before us. The jury, using its discretion to decide the facts before it, determined that American Graffiti had not made misrepresentations to Huey. It held that Church & Dwight had made misrepresentations. There was evidence to support this holding. Church & Dwight published a pamphlet claiming its product could be used on "virtually any surface." That pamphlet was given to Huey, just as a car dealer might pass on a manufacturer's warranty to a purchaser.

The second case cited by Church & Dwight is similarly inapplicable. In *Lemon v. Spann,* 633 S.W.2d 568 (Tex.App.—Texarkana 1982, writ ref'd n.r.e.), the Texarkana court of appeals held that where the rights or liabilities of a party are derivative, a judgment binding a party from whom the rights

or liabilities are derived may be set up as a bar in a second suit. *Lemon,* 633 S.W.2d at 570. However, the court defined derivative liability, in relevant part, as existing when establishing a judgment against one party is dependant upon first establishing a cause of action against another. This is not the case here. Huey might have brought suit directly against Church & Dwight, and, with the evidence presented at trial, could have been awarded damages.

While it is true that a portion of Huey's claim rests upon representations made by American Graffiti about the blasting media, Church & Dwight made independent representations and warranties, and the company can be held liable on that basis. Further, the jury was asked to find whether American Graffiti had engaged in any deceptive trade acts by "representing that goods or services had or would have characteristics, uses, benefits, or quantities which they do not have." The jury reasonably could have found that anything said by Taylor to Huey about Armex was not *Taylor's* representation, but Church & Dwight's. Thus, Church & Dwight's liability would not derive from Taylor's bad acts but from Church & Dwight's own misrepresentations that were passed on to a consumer in a transaction based solely on its product.

**Breach of Warranty**

█ Church & Dwight complains that the evidence was insufficient to support a finding that it had breached warranties made to Huey. We disagree. There was sufficient evidence for the jury to find that Church & Dwight had breached at least two warranties: an express warranty and the warranty of merchantability.[1]

█ A jury could have found that an express warranty existed and was breached. An express warranty is created when a seller makes an affirmation of fact or a promise to the purchaser that relates to the sale and becomes part of the basis of the bargain.

*See* Tex. Bus. & Com.Code § 2.313 (Vernon 1994); *McCrea v. Cubilla Condominium Corp., N.V.,* 685 S.W.2d 755, 757 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). An express warranty need not be a formal clause in a contract; it can be made orally or in less formal writings, such as Church & Dwight's pamphlet. *See United States Pipe & Foundry Co.,* 108 S.W.2d at 432 (express warranty can be made informally). To recover on an express warranty under the DTPA, a plaintiff must demonstrate that he or she is a consumer, that a warranty was made, that the warranty was breached, and that, as a result of the breach, the plaintiff suffered damages. *McDade v. Texas Commerce Bank, Nat'l Ass'n,* 822 S.W.2d 713, 718 (Tex.App.—Houston [1st Dist.] 1991, writ denied). No privity is required for such a warranty under the DTPA. *Basin Operating Co., Ltd. v. Valley Steel Prods. Co.,* 620 S.W.2d 773, 777 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.).

█ Church & Dwight represented in its own brochure and through information given to American Graffiti and passed on to its customers that its product could be used on virtually any substance and that it would rinse easily. These representations became part of the basis of the bargain between Huey and Church & Dwight. Church & Dwight claims, however, that it should not be held to those representations because the brochure demonstrates the product being used in a different context—a petrochemical plant—and is aimed at that use. In fact, the plaintiff's own corrosion expert testified that the product is suitable in a shop situation. However, the pamphlet broadly represents that the substance is safe on "virtually any surface" and contains no list of surfaces it would be unsafe on. The plaintiff's corrosion expert testified that this representation was false.

█ A jury could also have found that Church & Dwight breached the implied warranty of merchantability. This warranty

1. We do not agree with Huey's claim that the implied warranty of fitness for a particular purpose was violated. *See* Tex. Bus. & Com.Code § 2.315 (Vernon 1994). In order for this warranty to apply, the defendant must have known that the plaintiff intended to use the product for a particular purpose and that the plaintiff was relying on the defendant's expertise. *See id.; Cecil v. T.M.E. Investments, Inc.,* 893 S.W.2d 38, 54 (Tex.App.—Corpus 1994, no writ).

arises in every contract for goods or services unless specifically bargained out of the agreement. TEX. BUS. & COM.CODE ANN. § 2.314(b)(3) (Vernon 1994); *see Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W.2d 572, 577 (Tex.1991) (sellers may disclaim implied warranty in spite of no-waiver provision under DTPA). This warranty provides that the product is fit for its ordinary purposes. Privity is not required to enforce the implied warranty of merchantability. *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 80–1 (Tex.1977). To show a breach of the warranty, a plaintiff must demonstrate both that the goods are not fit and that they suffer from a defect rendering them unfit "because of a lack of something necessary for adequacy." *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 443–44 (Tex.1989). Church & Dwight argues that the latter factor does not exist here. We reject this argument. The product does suffer from an admitted lack: it lacks the ability to be rinsed away easily from some surfaces.

### Causation

■■■■ The jury had sufficient evidence to find that the DTPA violations (misrepresentations and breach of warranty) were producing causes of Huey's injury. A producing cause is a "substantial factor which brings about the injury and without which the injury would not have occurred." *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 481. Such a cause has the same cause-in-fact element as proximate cause, but does not require foreseeablity. *Id.* Under a pre–1995 DTPA claim, reliance is not required, but may be a factor in determining whether causation exists. *Cianfichi v. White House Motor Hotel*, 921 S.W.2d 441, 443 (Tex.App.—Houston [1st Dist] 1996, writ denied). Raising a fact question as to causation requires only that some evidence be introduced that the defendant's act or omission caused the plaintiff's injury. *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 481. Here, evidence was admitted that showed that Huey had been given marketing information that the product could be used on "any surface," and that it rinsed easily. Based on these representations, he purchased the product and suffered financial damages because of that

product's defects. This is sufficient to show causation.

### Knowledge

■■■ The jury also had enough evidence to find that Church & Dwight committed these DTPA violations knowingly. A finding of knowledge is a predicate for awarding additional damages under the DTPA. TEX. BUS. & COM.CODE § 17.50(b)(4) (Vernon 1987); *see Webb v. International Trucking Co. Inc.*, 909 S.W.2d 220, 223 (Tex.App.—San Antonio, no writ) (discussing award of additional damages based on knowledge finding). To prove knowledge, Huey has relied on the patent applications filed by Church & Dwight for an improved medium that would rinse away more easily. In its reply brief, Church & Dwight argues that this is insufficient evidence, because Huey was, in fact, using the improved product. Although the record clearly supports this claim, Church & Dwight apparently missed it until very recently; it was not raised during closing argument. In fact, the first this court heard of this claim was in a *reply* brief filed by Church & Dwight.

Church & Dwight's argument now is that while it may have known of defects in the earlier version, nothing in the record demonstrates knowledge of defects in the new product. However, a careful reading of the patent applications suggests that Church & Dwight never anticipated that the new product would totally eliminate the rinsing problems. In its application, Church & Dwight claims merely that the new product will *"minimize"* residue content and *"enhance"* removal. The application indicates that the new product "greatly *reduce[s]* " the residue and reports that test results show "great *improvement*" in the product's rinseability. The actual patent abstract says that the product *"reduces* the amount of water soluble residues of blast media remaining on the targeted surface." (Emphasis added).

Finally, there was ample testimony at trial that the product was corrosive and ate through caulking (a fact judicially admitted by Church & Dwight) and that the Travis Building was damaged by this. The new

patent did not address the corrosive nature of the product.

We believe the patent applications provide sufficient evidence upon which to base a knowledge finding.

## Unconscionability

■ Unconscionability under the DTPA requires a finding that the actor took advantage of the consumer's lack of knowledge or capacity to a gross degree or that the violation results in a gross disparity between value received and consideration paid. TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon 1987) (the 1995 revisions have deleted the disparity prong. *Id.* at § 17.45(5) (Vernon Supp.1997)). Unconscionability is generally found only where the seller's conduct is extreme. *See Bennett v. Bailey,* 597 S.W.2d 532, 535 (Tex.Civ.App.—Eastland 1980, writ ref'd n.r.e.) (finding seller who had aggressively induced an elderly widow to pay $30,-000 for dance lessons when she had improved all she was going to had engaged in unconscionable conduct). In reviewing a finding of unconscionability, a court must review the entire transaction. *Galveston County Fair & Rodeo, Inc. v. Kauffman,* 910 S.W.2d 129, 138 (Tex.App.—El Paso 1995, writ denied).

Church & Dwight behaved unconscionably under the second definition of that term in the DTPA.[2] There is gross disparity between what Huey paid for the Armex and the machinery and what he paid to cover his losses. To recover under this theory, an appellant must show that the disparity in value between what he got and what he bargained for is "complete and unmitigated." *Chastain v. Koonce,* 700 S.W.2d 579, 583 (Tex.1985). This disparity is demonstrated by comparing the price paid for the complained of good or service with the market value of the good, with its defect. *See Abbott Laboratories, Inc. v. Segura,* 907 S.W.2d 503, 510 (Tex. 1995) (Cornyn, J., concurring) (discussing gross disparity case law). Huey offers a comparison of what he paid for the Armex with the losses he incurred on the job. Those losses suggest, and the jury could easily have found, that the product as sold to Huey was worth less than nothing. Huey lost money trying to repair the damage done by Church & Dwight's product. This supports a finding of gross disparity.

## POINT OF ERROR TEN: ADMISSION OF HEARSAY EVIDENCE

In its final point of error, Church & Dwight claims that the trial court erroneously admitted patent applications and other patent documents showing its knowledge of defects in its product. The trial court found that the documents were self-authenticated under Texas Rule of Evidence 902 and admitted the documents over Church & Dwight's hearsay objection. We overrule Church & Dwight's point of error.

### Standard of Review

■ Decisions to admit or exclude evidence are largely within the trial judge's discretion and should be reversed only if there was error that was reasonably calculated to and probably did cause the rendition of an improper judgment. *City of San Antonio v. Rodriguez,* 934 S.W.2d 699, 704 (Tex. App.—San Antonio 1995), *rev'd on other grounds,* 931 S.W.2d 535 (Tex.1996). In evidentiary rulings there is usually not reversible error unless the whole case turns on the evidence admitted or excluded. *Id.*

■ Rule 902 of the Texas Rules of Civil Evidence provides that proof of the authenticity of certain documents is not a prerequisite to the admission of those documents into evidence. However, as Church & Dwight correctly argues, these documents are not directly admissible unless they fall within some exception to the hearsay rule. *Wright v. Lewis,* 777 S.W.2d 520, 524 (Tex.App.— Corpus Christi 1989, writ denied).

---

**2.** Because we find unconscionability under the second definition, we do not reach the first, but we note that the Texas Supreme Court has not held that indirect consumers cannot recover for unconscionability. *But see Abbott Laboratories, Inc. v. Segura,* 907 S.W.2d 503 (Tex.1995) (holding that, where DTPA claims duplicate anti-trust causes of action, indirect consumers who would be barred by antitrust laws are barred from the DTPA claims); *id.* at 509–11 (Cornyn, J., concurring) (arguing that relationship between purchasers of baby formula and manufacturers was not direct enough to support unconscionability finding).

## Discussion

■ The complained of evidence includes patent applications and documents acquired from the United States Patent and Trademark Office and the testimony of an expert who analyzed those files. If Church & Dwight is right that the admission of this evidence was erroneous, this would necessarily constitute harmful error. Without the patent applications, Huey could not have proven that Church & Dwight made knowing misrepresentations about its product. Proof of knowledge makes the findings of additional damages possible under the DTPA.

Huey argues that (1) some of the documents were admissible as party admissions and not hearsay; (2) some of the documents are admissible as official records and thus fall under the public records hearsay exception; (3) some of the documents are admissible not to prove the matter asserted but to show Church & Dwight's knowledge; and (4) Church & Dwight waived its hearsay objection by raising only a general objection and not requesting a limiting instruction and by not separating the admissible portion of the documents from the inadmissible portion.

■ Huey has the better argument. The patent applications and descriptions of problems with the prior art were filled out by Church & Dwight, and are admissible as party admissions. TEX.R. CIV. EVID. 801(e)(2); *cf. Wenk v. City Nat'l Bank*, 613 S.W.2d 345, 349 (Tex.Civ.App.—Tyler 1981, no writ) (credit card applications admissible as party admissions). The documents generated by the Patent Office qualify as official records and are admissible as a hearsay exception. TEX.R. CIV. EVID. 803(8); *see also Standard Havens Prods. v. Gencor Indus.*, 953 F.2d 1360, 1371–2 (Fed.Cir.1991) (patent documents fall under public records exception in the federal rules of evidence), *cert. denied*, 506 U.S. 817, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992). The patent applications are also admissible as non-hearsay, not to show the truth of the deficiency of the product but to show Church & Dwight's knowledge of any deficiency. *See Wal–Mart Stores Inc., v. Berry*, 833 S.W.2d 587, 593 (Tex.App.—Texarkana 1992, writ denied) (hearsay testimony was admissible to show store's knowledge of danger to customers).

■ Because the documents were admissible on these bases, it was incumbent upon Church & Dwight to request a limiting instruction requesting that the evidence not be admitted to show the truth of charges against it. *See* TEX.R. CIV. EVID. 105(a) (if evidence is admissible for one purpose, but not another, there must be a limiting instruction, or the objection cannot serve as the grounds for an appeal); *Berry*, 833 S.W.2d at 593. In addition, when evidence is erroneously admitted, it is the duty of the objecting party to separate the inadmissible evidence from the admissible evidence. *Speier v. Webster College*, 616 S.W.2d 617, 619 (Tex. 1981) ("a general objection to a unit of evidence as a whole, ... which does not point out specifically the portion objected to, is properly overruled if any part of it is admissible"), *quoting Brown & Root, Inc. v. Haddad*, 142 Tex. 624, 180 S.W.2d 339 (1944).

## CONCLUSION

Finding that the general and well-settled rule articulated in *Amstadt* protects Church & Dwight from its own misrepresentations would be a misreading of the law on this issue. Church & Dwight did not manufacture a good that became part of the actual product bargained for by the purchaser. Huey bargained for the product itself. Further, Church & Dwight did participate in the consumer transaction at issue; it was Church & Dwight's product that Huey bargained for and, on the basis of Church & Dwight's representations, purchased.

The patent evidence was admissible at trial under several theories and, at any rate, any error on the scope of admission was waived by Church & Dwight. These applications, together with the evidence of the damage caused by Church & Dwight's product provide legal and factually sufficient evidence for the jury's verdict. We affirm the judgment.