11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Troy Hunt and Troy Hunt
Homes, Inc.

Appellants

Vs.                   No.
11-00-00222-CV B Appeal from Scurry County

Billy Stephens and wife,
Kendra Stephens

Appellees

 

The trial
court, in a nonjury case, found that appellants, Troy Hunt and Troy Hunt Homes,
Inc., constructed a defective residential dwelling for appellees, Billy
Stephens and wife, Kendra Stephens.  The
court found that appellees sustained economic damages of $93,975 and mental
anguish damages of $5,000.  In its
findings of facts and conclusions of law, the court found that appellants
knowingly and intentionally breached an express warranty to provide appellees a
1 year builder=s warranty. 
The court trebled the economic damages; concluded that Troy Hunt Homes,
Inc. was the alter ego of Troy Hunt, individually; and entered judgment against
appellants, jointly and severally, for $286,975.  Appellants appeal.  We
reverse the award of treble damages, affirm the award of mental anguish
damages, and suggest a remittitur because we find that the evidence is
factually insufficient to support the trial court=s finding that appellees sustained economic damages of $93,975.

Appellees
and Troy Hunt Homes, Inc. entered into a written contract which provided that
Troy Hunt Homes, Inc. would build a residential dwelling on a lot owned by
appellees.  The agreed cost for building
the house was $146,702.  Troy Hunt
signed the contract as president of Troy Hunt Homes, Inc.  Within 6 months afer appellees moved into
the house, they began to notice cracks around the doors and cracks through the
sheet rock.  The tile floor and tile
around the fireplace began to crack. 
Bricks were cracking in the back patio. 
None of the doors would fit properly. 
Appellees observed a 2-inch gap where the baseboards met the floor.  One day, appellees discovered that a snake
had gotten into the kitchen.








All of the
parties agree that the substantial damages to the house were caused by the
settling of the concrete slab foundation. 
Appellees contend that the settling was caused by appellants= defective construction.  Appellants contend that the slab foundation
failed because of subsurface conditions in the soil on the lot owned by
appellees.

                                                          Appellees= Expert Witness

Jerry Lee
Hargrave testified that he had been in the construction business, either full
time or part time, for 35 years.  He was
presently in the foundation repair business and had personally participated in
over 3,000 foundation repair jobs in the last 15 years.  Hargrave stated that, in 35 years, he had
seen may different causes for foundation problems.  Hargrave inspected appellees= house and found extreme foundation settlement.  Hargrave testified that approximately 75
percent of the foundation was affected.

Appellants
argue on appeal that the trial court abused its discretion in allowing Hargrave
to give his opinion as to what caused the foundation to fail.  Appellants timely urged a Daubert[1]
challenge and objected to any testimony from Hargrave on the issue of causation
because Hargrave did not have the technical training and background to give
such an opinion.  The Texas Supreme
Court in Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726-27
(Tex.1998), stated:

We agree
with the Fifth, Sixth, Ninth, and Eleventh Circuits that [TEX.R.EVID.] 702's
fundamental requirements of reliability and relevance are applicable to all
expert testimony offered under that rule. 
Nothing in the language of the rule suggests that opinions based on
scientific knowledge should be treated any differently than opinions based on
technical or other specialized knowledge. 
It would be an odd rule of evidence that insisted that some expert
opinions be reliable but not others. 
All expert testimony should be shown to be reliable before it is
admitted.

 








That said, it is equally
clear that the considerations listed in Daubert and in Robinson
for assessing the reliability of scientific evidence cannot always be used with
other kinds of expert testimony.  To
borrow the [Berry v. City of Detroit, 25 F.3d 1342 (6th Cir. 1994)] court=s analogy, a beekeeper need not have
published his findings that bees take off into the wind in a journal for peer
review, or made an elaborate test of his hypotheses.  Observations of enough bees in various circumstances to show a
pattern would be enough to support his opinion.  But there must be some basis for the opinion offered to show its
reliability.  Experience alone may
provide a sufficient basis for an expert=s testimony in some cases, but it cannot do so in every case.  A more experienced expert may offer
unreliable opinions, and a lesser experienced expert=s opinions may have solid footing.  The court in discharging its duty as
gatekeeper must determine how the reliability of particular testimony is to be
assessed.

 

The
court added:

Although it appears that
the United States Supreme Court will address the issue in Carmichael, at
this point the clear weight of federal case law supports applying the relevance
and reliability requirements of Rule 702 to all expert evidence offered under
that rule, even though the criteria for assessing relevance and reliability
must vary, depending on the nature of the evidence.  Because we are persuaded that this construction of federal Rule
702 is correct, because our rule is identical but for one comma, and because
there is much to be said for maintaining as much uniformity  in state and federal evidence rules as
possible, we hold that the relevance and reliability requirements of Texas Rule
702 apply to all evidence offered under that rule, and that the trial court
must determine that these requirements have been met before admitting the
evidence.

 

See
Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137 (1999).

The trial court, as the gatekeeper, heard the evidence as to Hargrave=s special knowledge about concrete slabs and
foundations.  Hargrave inspected the
house and reviewed photographs taken of the building site before the slab was
poured.  From the location and extent of
the damage, Hargrave concluded that the soil that was placed inside the form
boards as fill material was not adequately compacted.  We hold that the trial court did not abuse its discretion in
permitting Hargrave=s
testimony on the causation issue.

Appellants challenge the sufficiency of the evidence to support the
trial court=s findings that the damages sustained by
appellees were proximately caused by appellants= construction defects.








A trial court=s findings are reviewable for legal and
factual sufficiency of the evidence by the same standards that are applied in
reviewing evidence supporting a jury=s answer.  Catalina v. Blasdel,
881 S.W.2d 295 (Tex.1994).  In reviewing
a no-evidence point of error, a reviewing court may consider only the evidence
and inferences supporting the findings and will disregard all evidence and
inferences to the contrary; and, if there is any evidence of probative force to
support the finding, the reviewing court will overrule the no-evidence
point.  Davis v. City of San Antonio,
752 S.W.2d 518 (Tex.1988).  In reviewing
a factual sufficiency challenge of the evidence, the court must examine and
weigh all of the evidence and reverse the judgment only if the court finds that
the evidence is factually insufficient or is so against the great weight and
preponderance of the evidence as to be manifestly unjust.  Pool v. Ford Motor Company, 715 S.W.2d 629
(Tex.1986).  The trial court accepted
the evidence presented by appellees, and rejected the testimony of appellants= expert witness that the foundation failed
because of subsurface conditions in the soil. 
The evidence is both legally and factually sufficient to support the
trial court=s findings that the foundation failed because
of defective construction by appellants.

Appellees
called Hargrave as a rebuttal witness. 
Hargrave testified that, after appellants= expert testified, Hargrave went to appellees= house, drilled some holes in the foundation,
and measured the depth of some footers and fill dirt.  Appellants objected to this type of testimony, arguing that it
was a new test by an expert with new results that appellants had not had a
chance to inspect.  The trial court
instructed the parties that the court would hear the evidence and then decide
if appellants would be given additional time to examine the rebuttal
evidence.  Hargrave=s testimony clearly rebutted some of the
evidence presented by appellants= expert.  After Hargrave was
cross-examined, the court accepted appellants= suggestion that the trial be recessed and appellants be given seven
days in which to notify the court if appellants wished to do additional
testing.  Within the seven-day period,
appellants informed the court by letter that, because of the expense involved
in additional testing, appellants would not conduct any additional
testing.  Appellants requested the court
to close the evidence.  In the letter,
appellants re-urged their position that Hargrave=s testimony should not be considered by the court.

We do not
think that the trial court abused its discretion in allowing Hargrave=s rebuttal testimony.  The trial court carefully explained to the
parties that the evidence would only be considered as rebuttal.  The trial court stated:








I received and understood
this testimony to accomplish two things from the Plaintiffs= perspective.  One, to suggest that the testimony about depth of the footer was
not correct and, two, to rebut the testimony that there was no fill dirt under
the footers was not correct.  That=s what I received it, that this shows that
the footer was only about nine to ten inches in depth.  The slab was roughly four.  When the testimony was, as I understood it,
as shown by the paper there, as much as sixteen inches deep with another stem
of twelve inches on top of that with a slab on top of that, some twenty-six to
thirty inches from top of slab to native soil like that.  And this says that testimony is incorrect.  That=s the way I heard.  If I heard
it wrong, I sure would appreciate being corrected.

 

Furthermore,
if we are in error and the trial court abused its discretion in permitting the
rebuttal testimony, we hold that Hargrave=s testimony probably did not cause the rendition of an improper
judgment.  TEX.R.APP.P. 44.1.  Hargrave was vigorously cross-examined
regarding his testimony and his failure to properly test at various locations
in the foundation.  Also, appellants
presented testimony rebutting Hargrave=s testimony.  Appellants= complaints, Issues Nos. 2, 3, and 4
regarding the testimony of Hargrave and sufficiency of the evidence on
causation, are overruled.

                                              Piercing
the Corporate Veil 

Troy Hunt and his wife owned all of the stock in Troy Hunt Homes,
Inc.  The trial court concluded that
Troy Hunt Homes, Inc. was the alter ego of Troy Hunt, individually, and that
the corporation was a sham corporation for the personal and family interests of
Troy Hunt, individually. 

In the findings of fact, the trial court found that Troy Hunt,
individually, used the corporation, Troy Hunt Homes, Inc., for personal
purposes; that the property of the corporation was not kept separate from the
personal property of Troy Hunt; that some of Hunt=s automobiles, including those of Hunt=s children, were not maintained separately from the corporation; and
that country club dues and fees for Hunt, his wife, and children were paid by
the corporation.  The trial court also
found that several corporate formalities were not kept by the corporation.  The trial court found expressly that Troy
Hunt Homes, Inc. was a sham corporation.

Troy Hunt testified that Troy Hunt Homes, Inc. no longer exists.  Troy Hunt now builds houses under a new
business entity, Troy Hunt, Ltd.  Hunt
testified:

Q: Now, you said the
corporation doesn=t
exist anymore.  That=s because you moved all the assets out of the
corporation, didn=t you?

 

A: No, there wasn=t any assets to move.  I finished the last house in the corporation
and my next new house that was sold went into the Limited Partnership.

 








Troy Hunt testified that
his new partnership, Troy Hunt, Ltd., is paying the legal fees in the instant
case for Troy Hunt, Individually, and Troy Hunt Homes, Inc.  Troy Hunt testified that Troy Hunt Homes,
Inc. has no money, no homes, and no assets.

The court
in Castleberry v. Branscum, 721 S.W.2d 270, 275 (Tex.1986), stated:

In
determining if there is an abuse of the corporate privilege, courts must look
through the form of complex transactions to the substance.  The variety of shams is infinite, but many
fit this case=s pattern: a closely held corporation owes
unwanted obligations; it siphons off corporate revenues, sells off much of the
corporate assets, or does other acts to hinder the on-going business and its
ability to pay off its debts; a new business then starts up that is basically a
continuation of the old business with many of the same shareholders, officers,
and directors.

 

TEX. BUS. CORP. ACT ANN. art. 2.21 (Vernon Supp. 2002) reads in part:

A.  A holder of shares, an owner of any
beneficial interest in shares, or a subscriber for shares whose subscription
has been accepted, or any affiliate thereof or of the corporation, shall be
under no obligation to the corporation or to its obligees with respect to:

 

(2) any
contractual obligation of the corporation or any matter relating to or arising
from the obligation on the basis that the holder, owner, subscriber, or
affiliate is or was the alter ego of the corporation, or on the basis of actual
fraud or constructive fraud, a sham to perpetrate a fraud, or other similar
theory, unless the obligee demonstrates that the holder, owner, subscriber, or
affiliate caused the corporation to be used for the purpose of perpetrating and
did perpetrate an actual fraud on the obligee primarily for the direct personal
benefit of the holder, owner, subscriber, or affiliate; or

 

(3) any
obligation of the corporation on the basis of the failure of the corporation to
observe any corporate formality, including without limitation: (a) the failure
to comply with any requirement of this Act or of the articles of incorporation
or bylaws of the corporation; or (b) the failure to observe any requirement
prescribed by this Act or by the articles of incorporation or bylaws for acts
to be taken by the corporation, its board or directors, or its shareholders.

 

See also Farr v. Sun
World Savings Association, 810 S.W.2d 294 (Tex.App. - El Paso 1991, no writ).








The trial
court found that the corporation was a Asham.@  A
sham is defined in BLACK=S LAW DICTIONARY 1375 (rev. 6th ed. 1990) as A[f]alse dealings.@  The
trial court could have expressly found from the evidence that Troy Hunt
permitted Troy Hunt Homes, Inc. to have no assets and cease to exist for the
purpose of perpetrating an actual fraud on appellees primarily for the direct
personal benefit of Troy Hunt.  Any
omitted elements supported by the evidence will be supplied by presumption in
support of the judgment.  See
TEX.R.CIV.P. 299.  The evidence would
also support a conclusion of law that the corporation was used as a sham to
perpetrate a fraud.  See Farr v. Sun
World Savings Association, supra.  We
have not considered the failure of the corporation to observe any corporate
formalities because of the language in Article 2.21A(3).  The evidence is both legally and factually
sufficient  to support the piercing of
the corporate veil.  See Castleberry v.
Branscum, supra.  Appellants= Issue No. 1 is overruled.

                                                                       Damages

Appellees
sought damages pursuant to the Residential Construction Liability Act (RCLA)[2]
and the Deceptive Trade Practices-Consumer Protection Act (DTPA).[3]  Appellees= DTPA claims are not preempted by the RCLA in this case because the
court found, and the evidence is both legally and factually sufficient to
support such finding, that appellants failed to make a reasonable offer of
settlement to appellees.  The court in Perry
Homes v. Alwattari, 33 S.W.3d 376, 384 (Tex.App. - Fort Worth 2000, pet=n den=d), held:

We,
therefore, hold that, under subsection 27.004(g), the effect of a contractor=s failure to make a reasonable settlement
offer is that the contractor loses the benefit of all limitations on damages
and defenses to liability provided for in section 27.004, including both the
limitation of subsection 27.004(h) on the types of damages recoverable by a
homeowner and the limitation of subsection 27.004(i) on the amount of damages
recoverable by a homeowner.

 

 

The
construction contract signed by appellees and Troy Hunt as president of Troy
Hunt Homes, Inc. provided:

5.                 
WARRANTIES:  In connection with all improvements,
fixtures and all other property located on or made a part of the Property:

 

Seller
makes the express warranties stated in Paragraph 11 or attached.

 

Paragraph No. 11B of the
contract reads:

 

SPECIAL PROVISIONS:  Builder shall provide standard 1 Year Builder=s Warranty.

 

In its findings of fact,
the trial court found in part:

15.  Defendant expressly warranted that Defendant
would provide a Astandard one (1) year Builder=s Warranty@ on the residential dwelling.

 

22.
Defendants= breach of the express warranty to provide a
one (1) year builder=s
warranty was committed knowingly and intentionally.

 

Section 17.50 of the DTPA
provides in relevant part:

(a) A
consumer may maintain an action where any of the following constitute a
producing cause of economic damages or damages for mental anguish:

 

(1) the
use or employment by any person of a false, misleading, or deceptive act or
practice that is:

 

(A)
specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of
this subchapter; and

 

(B) relied
on by a consumer to the consumer=s detriment;

 

(2)
breach of an express or implied warranty;

 

(3)
any unconscionable action or course of action by any person; or

 

(4)
the use or employment by any person of an act or practice in violation of
Article 21.21, Insurance Code.

 








(b) In a suit filed under
this section, each consumer who prevails may obtain:

 

(1) the
amount of economic damages found by the trier of fact.  If the trier of fact finds that the conduct
of the defendant was committed knowingly, the consumer may also recover damages
for mental anguish, as found by the trier of fact, and the trier of fact may
award not more than three times the amount of economic damages; or if the trier
of fact finds the conduct was committed intentionally, the consumer may recover
damages for mental anguish, as found by the trier of fact, and the trier of
fact may award not more than three times the amount of damages for mental
anguish and economic damages.

 

The trial
court found Aeconomic@ damages of $93,975.  This
amount was trebled.  The trial court
found Amental anguish@ damages of $5,000.  This amount
was not trebled because the trial court found that appellees had only pleaded
for $5,000 mental anguish damages.

Finding of
Fact No. 22 is the only Aknowingly and intentionally@ finding made by the trial court. 
This is obviously the finding used by the trial court to assess treble
damages.  The record does not contain a Astandard one (1) year Builder=s Warranty.@  The evidence does not
establish such a warranty as to foundations or slabs.  Appellants did agree to provide a standard one year builder=s warranty. 
Appellants did not comply with that provision of the agreement.  However, the failure to comply with the
provision in the contract was not a Abreach of an express warranty@ as contemplated by Section 17.50. 
The warranties, both express and implied, actionable under the DTPA must
be recognized by the common law or created by statute.  Parkway v. Woodruff, 901 S.W.2d 434
(Tex.1995).  Appellees had the burden to
prove that the Aexpress warranty@ was made by appellants and that the express
warranty was breached.  See Church &
Dwight Co., Inc. v. Huey, 961 S.W.2d 560 (Tex.App. - San Antonio 1997, pet=n den=d); McDade v. Texas Commerce Bank National Association, 822 S.W.2d 713
(Tex.App. - Houston [1st Dist.] 1991, writ den=d).  Appellees merely proved
that appellants breached the contract, not that appellants breached an Aexpress warranty.@ 
Appellees failed to prove a breach of an Aexpress warranty@ under Section 17.50 of the DTPA. 
There are neither findings of fact nor evidence to support the treble
damages ordered by the trial court.








The trial
court did find in its findings of fact that appellants impliedly warranted that
the house would be built in a good and workmanlike manner and that appellants
failed to construct the residential dwelling in a good and workmanlike
manner.  However, the trial court
expressly found that appellants= breach of the implied warranty to construct the house in a good and
workmanlike manner was Anot committed knowingly and intentionally.@ 
These findings, which are supported by both legally and factually
sufficient evidence, will support the trial court=s finding that appellees sustained Aeconomic damages.@  See Evans v. J. Stiles, Inc.,
689 S.W.2d 399 (Tex.1985); Melody Home Manufacturing Company v. Barnes, 741
S.W.2d 349 (Tex.1987); Humber v. Morton, 426 S.W.2d 554 (Tex.1968).  

We further
find that the evidence is both legally and factually sufficient to support the
$5,000 awarded by the court for mental anguish.  Kendra Stephens testified as follows:

Q: As a
result of the damages to your home have you C how has it affected you personally, if it has at all?

 

A: Oh, it=s been very trying.

 

Q: In what
respect?

 

A: I mean
this whole deal has tried our faith, our marriage, our C I mean our three year old, that=s all he=s known.  You know, we moved
into the house in October and started having problems six months later and, you
know, when your three year old asks, ADaddy, why won=t that
man fix your house,@ what
do you tell him?

 

Q: How did
you feel about that?

 

A: Well,
it doesn=t make me feel very good at all.

 

Q: Have
you C are there manifestations or do you have
specific symptoms that you relate to this experience?

 

A: I mean
the emotional, I guess C I mean I=m
going to say it hasn=t been
easy because it hasn=t
been.  

 

Q: When
you say this experience has challenged your marriage, what do you mean by that?

 

A: When
you go home from work, all you see is, you know, cracks through your ceiling,
your fireplace is falling apart, your C I mean it=s not
like it=s something that we can get away from.  You know, it=s our home and, you know, it=s C it has consumed me, I would admit that.  It has affected my work.

 








Q: You mentioned earlier
that there was at one point a snake in your kitchen. How did you feel when that
happened?

 

A: It scared me to
death.  I was just thankful it was me
and not one of the kids.  I walked in
there one morning and I saw something out of the corner of my eye over on my
kitchen floor and I thought, you know, one of the kids had left a belt or
whatever.  When I got closer, it was a
snake.

 

                            Suggestion
of Remittitur as to Economic Damages

Appellees
are entitled under the evidence and findings of fact to economic damages and to
$5,000 in mental anguish damages. 
Appellees paid appellants $146,702 to build the house.  Appellees= expert appraiser testified that, after inspection of the house and the
defective foundation, the house had a fair market value of $81,000.  The contract price minus the market value of
the defective house equals $65,702.  The
trial court found that appellees suffered economic damages of $93,975 because
of the reduction in the fair market value. 
This figure is found in a report made by the appraiser.  It is apparent from the report that the
appraiser=s finding of $93,975 ADepreciation@ was not related to the contract cost to build the house.  For instance, the contract included a
three-car garage which had a cost of $4,000. 
The report prepared by the appraiser showed a AGarage/Carport@ cost of $18,850.  The evidence
is factually insufficient to support any amount of economic damages above
$65,702.  See Pope v. Moore, 711 S.W.2d
622 (Tex.1986).  

Therefore,
we suggest a remittitur of $28,273.  If
appellees file such remittitur within 20 days from September 12, 2002, the date
of this opinion, we will modify the judgment of the trial court to provide that
appellees be awarded economic damages of $65,702 and mental anguish damages of
$5,000 against appellants, jointly and severally, and affirm the judgment as
modified.  If the suggested remittitur
is not timely filed, we will reverse the entire trial court=s judgment and remand the cause to the trial
court for a new trial.  TEX.R.APP.P.
46.3; Rose v. Doctors Hospital, 801 S.W.2d 841 (Tex.1990); Larson v. Cactus
Utility Company, 730 S.W.2d 640 (Tex.1987); Pope v. Moore, supra.

The
judgment of the trial court is affirmed as to the award of $5,000 for mental
anguish and is reversed and rendered as to the award of treble damages.  A suggestion of remittitur is made
concerning the economic damages.

 

AUSTIN
McCLOUD

SENIOR
JUSTICE

 

September 12, 2002

Do not publish.  See TEX.R.APP.P. 47.3(b).

Panel consists of:  Wright, J., and

McCall, J., and McCloud, S.J.[4]











[1]Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.
579 (1993).  See also E.I. du Pont de
Nemours and Company, Inc. v. Robinson, 923 S.W.2d 549 (Tex.1995).





[2]TEX. PROP. CODE ANN. '
27.001 et seq. (Vernon 2000).





[3]TEX. BUS. & COM. CODE ANN. ' 17.41 et seq. (Vernon 2002).





[4]Austin McCloud, Retired Chief Justice, Court of
Appeals, 11th District of Texas at Eastland sitting by assignment.