COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-413-CV

SCRUGGS MANAGEMENT APPELLANT

SERVICES, INC.

V.

LLOYD E. HANSON AND APPELLEES

TIG INSURANCE COMPANY

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM
 
OPINION
(footnote: 1)

------------

I.  Introduction

In nine issues, Appellant Scruggs Management Services, Inc. (“SM”) asserts error on the part of the trial court in granting summary judgments in favor of Appellees Lloyd E. Hanson and TIG Insurance Company and error in the jury’s responses to Jury Question No. 1.  We affirm.

II.  Factual Background

Lloyd Hanson worked for twelve years beginning in 1986 in the Reinsurance Department of TIG, an insurance company based in Irving, Texas.  His job responsibilities included negotiating, interpreting, documenting, and accounting for all of TIG’s reinsurance agreements or treaties.  During his tenure with TIG, he developed considerable expertise in keeping track of reinsurance claims and in finding “missed” reinsurance claims.

Hanson served as TIG’s Vice President and Director of Ceded Reinsurance for his last four years with the company before leaving in 1998.  As part of his severance package, he agreed to assist TIG whenever he was needed on reinsurance matters in which he had been involved and was asked by TIG to do some work on reinsurance matters shortly after he left the company.

SM is a corporation which provides, among other things, services to commercial and insurance customers throughout the United States.  During the fourth quarter of 1998, Steve Cook, the former Corporate Controller of TIG, (“Cook”) introduced Hanson to Michael Scruggs (“Scruggs”) and SM’s Executive Vice President Geoff Banta (“Banta”).  Hanson had recently left TIG’s employment and Cook believed that Hanson might be interested in employment by SM.  Scruggs and Banta met with Hanson several times, sometimes with Cook, to determine whether or not Hanson might make a good fit with SM.  Hanson represented to Scruggs that if SM hired Hanson, he would help SM increase the level of services that it was already providing to TIG.  Specifically, Hanson represented that he knew where tens of millions of dollars of “missed reinsurance” recoverables could be located at TIG.  With that knowledge and SM’s resources and relationship with TIG, Hanson indicated that if SM employed him, he could help generate millions of dollars of additional revenue from TIG alone.

Hanson was employed by SM as of February 1, 1999.  As a condition of employment in each of Hanson’s positions, he was required to execute an employment agreement.  Each time Hanson’s employment agreement was renewed and extended, he was required to execute a renewal employment agreement.  The February 1, 1999 agreement allowed SM to terminate Hanson’s employment for cause on one hour’s notice and to fire him without cause on thirty days’ notice.  The agreement also contained restrictions on Hanson’s ability to work if he left SM, including two year prohibitions on Hanson (1) soliciting “covered customers”
(footnote: 2) in the “restricted area” (a 150-mile radius around any office where Hanson worked or where a covered customer was present) or (2) working for a competing business in the “restricted area.” Finally, the agreement stated that Hanson “will be or has been . . . given access to” certain “Protected Information” (trade secrets and confidential or propriety information) and that he would use such information for the exclusive benefit of SM.

On or about October 1, 2000, SM promoted Hanson and elected him to the position of Chief Operating Officer (“COO”).  That same month Hanson signed a second employment agreement containing the same provisions as the February 1999 agreement.  Hanson was the COO of SM from October 1, 2000 through October 8, 2001.

SM asserted that it provided Hanson, contemporaneously with Hanson’s execution of his employment agreements with password-protected, secure login privileges to SM’s network, as well as access to all of its hard-copy client and business planning files.  This provided Hanson, according to SM, access on his first day of employment to virtually all of SM’s confidential information, except for SM’s bookkeeping software, financial statements, and human resource information.  At the time that Hanson was elected and promoted to COO of SM (October 1, 2000), he allegedly was also provided with additional login privileges to SM’s network, which included all of SM’s client files, billing and timekeeping software from which all client services and client needs could be determined, bookkeeping software, financial statements, and human resource information.  By the time that Hanson tendered his notice of resignation as the COO of SM on September 26, 2001, Hanson had access to all of SM’s proprietary and confidential information, including, but not limited to, financial statements, business plans, marketing plans, human resources documentation, and client information (past, current, and prospective).

According to Hanson, SM did not provide him with any trade secrets or confidential or proprietary information when he signed the February 1, 1999 employment agreement.
(footnote: 3)  Hanson also swore that, during the course of his employment relationship with SM, he was never given any information that he was told was a trade secret, confidential, or proprietary and never received any information that he believed fell into those categories.  Hanson also asserted that SM never gave him any specialized training.

During Hanson’s first month of employment at SM, he worked with Geoff Banta and Mike Scruggs to prepare a business development opportunities (“BDO”) plan for reinsurance.  SM asserted that BDO plans are among the most secret and proprietary information that any company owns and were among the most secret and propriety information developed and owned by SM.  According to SM, these BDO plans, strategic plans, client proposal and need materials, and client identification materials provided SM with a competitive advantage over its competitors and were kept in password protected and restricted access locked file cabinets (both electronic and paper) in order to protect their secrecy.  This BDO plan formed the basis for the services that Hanson marketed to customers and prospective customers of SM, including TIG, during his employment with SM, as well as the services that Hanson marketed to, and ultimately provided to, TIG and others following the termination of his employment at SM.

Hanson, while employed by and on behalf of SM, performed consulting services, including reinsurance services, for TIG and made proposals to TIG to perform reinsurance related consulting services.

Hanson submitted his resignation letter, containing an effective date of October 15, 2001, to SM in September 2001.  However, SM terminated Hanson’s employment on October 8, 2001.  Prior to his resignation, TIG contacted him about a reinsurance matter to determine whether he had any personal knowledge of the matter from his previous work for TIG.  TIG told Hanson that he might be needed for a deposition at some point but no specific request was made at the time.  Hanson advised SM of this conversation.  After leaving SM, Hanson provided background information to TIG and gave deposition testimony on reinsurance matters that he was personally involved in while he was employed by TIG.  He also performed work for one of SM’s clients, Scott Logan and Associates, at the request of Scruggs.

According to SM, Hanson was employed at great expense to SM, and it made a very significant investment of time, money, and employee assets to expand and market its capabilities to provide missed reinsurance consulting, among other services.  SM placed Hanson in the position of SM’s primary marketing contact for SM’s reinsurance services.  Hanson estimated that it would take one and a half to two years to profitably expand the reinsurance business at SM.

SM alleged that it incurred direct costs with Hanson’s employment in excess of $475,000.  Hanson agreed that the amounts paid by TIG to Hanson totaled in excess of $350,000 through September 30, 2003.  According to SM, if calculated at the same average per month, TIG paid Hanson in excess of $500,000 through December 31, 2004.  Hanson billed his post-SM time to TIG at the rate of $150 to $175 per hour.  SM had historically billed Hanson’s time to TIG at $300 per hour, and TIG paid such rate.  At SM standard hourly rates agreed to by TIG, SM would have billed approximately $1 million for Hanson’s services during the same approximately three-year period.  If SM had paid Hanson his highest post-termination hourly rate of $175 per hour, SM would have earned in excess of $350,000.
(footnote: 4)
 According to Hanson, other than his work for TIG and Scott Logan and Associates, Hanson had not worked for or attempted to solicit any client of SM.  Scruggs testified that, since Hanson’s resignation, (1) SM was not aware of any company client that Hanson has contacted (other than TIG), (2) SM had not lost any customers that it attributed to Hanson’s actions, and (3) SM had not made any proposals to do any type of work for TIG.  Since leaving SM, Hanson urged that he had not used or attempted to use any of its trade secrets or confidential or proprietary information.

Hanson argued that TIG would not have retained SM without Hanson because Hanson’s knowledge and expertise were “unique,” “necessary,” “required,” “needed,” “extensive,” and “greater than any other person, including former TIG employees.”

Prior to filing this lawsuit, Hanson never submitted any writing challenging the reasonableness of the scope, clarity, applicability, or enforceability of any provision of the employment agreements or any of the restrictions contained therein.  Prior to filing the lawsuit, Hanson never met with a company representative to discuss a resolution of any such challenge to the reasonableness of the scope, clarity, applicability, or enforceability of any provision of the employment agreements or any of the restrictions contained therein.  Likewise, however, before suing Hanson, SM never advised him that he was supposedly violating the employment agreement.

III.  Procedural Background

SM sued Hanson in July 2002 seeking injunctive relief and monetary damages for, among other things, Hanson’s alleged breach of his employment agreement.  Subsequently, SM added TIG as a defendant on the theory that it had tortiously interfered with the contractual relationship between Hanson and SM.

On February 13, 2005, the trial court granted a partial summary judgment for SM on the enforceability of the employment agreement’s post-employment restrictions.  However, on March 15, 2005, the trial court vacated that order and granted summary judgment for TIG on the tortious interference claim, based on the conclusion that the promises supporting consideration for the noncompete covenant were illusory.

Also on March 15, 2005, the trial court awarded Hanson summary judgment on  SM’s claims for (1) tortious interference with existing contractual relations, (2) misappropriation of trade secrets, and (3) breach of contract.  The trial court granted Hanson’s summary judgment for breach of contract on the basis that, under 
31W Insulation Co. v. Dickie
, the promises supporting consideration for the noncompete agreement were illusory and therefore unenforceable.  
144 S.W.3d 153, 158 (Tex. App.—Fort Worth 2004, pet. withdrawn).  A review of the December 10, 2004 motion for summary judgment filed by Hanson, however, shows that Hanson did not move for summary judgment based on 
31W
 or any of the following: that there existed no valid contract; that the noncompete was unenforceable; or that Hanson had not breached the contract.  Instead, the December 10, 2004 motion for summary judgment shows that Hanson moved for summary judgment on SM’s claim for breach of contract, solely upon the basis that SM suffered no damages from Hanson’s breach of contract.

On May 6, 2005, the trial court heard additional motions for summary judgment and partial summary judgment:  (1) Hanson’s March 9, 2005 motion for partial summary judgment filed on the basis that after adequate time for discovery, there was not any evidence of a valid and enforceable noncompete provision; (2) Hanson’s second motion for partial summary judgment filed April 11, 2005, on the basis that the John Newton
(footnote: 5) employment agreement was the same as the Hanson employment agreement and therefore was unenforceable as a matter of law; (3) TIG’s April 15, 2005 motion for summary judgment was filed on the basis that there was not any evidence to support SM’s claims of conspiracy; and (4) the April 29, 2005 motion for reconsideration of summary judgment in favor of TIG on SM’s tortious interference claim.

SM ultimately nonsuited its conspiracy claims against TIG, and on May 23, 2005, the case proceeded to trial on the remaining claims against Hanson, all of which arose out of Hanson’s fiduciary duties.  At the conclusion of the evidence, the court submitted the questions of fact to the jury.  The jury returned a verdict for Hanson and the court ordered that SM take nothing from Hanson on all of SM’s remaining claims. 

Originally, the trial court orally pronounced its orders granting summary judgment; however, due to the parties’ disagreements as to form of the proposed orders, the trial court incorporated a written order into its final judgment.  The September 7, 2005 final judgment made clear that the court had granted Hanson’s and TIG’s summary judgments based upon this court’s opinion in 
31W
.  
Id.
  Hanson’s summary judgment for SM’s claim—that Hanson had tortiously interfered with the employment agreement between nonparty Newton and SM—was awarded on the basis that the noncompetition clause in Hanson’s and Newton’s employment agreements was unenforceable for want of consideration.
 
 Id. 
at 158.  Furthermore, the trial court awarded TIG summary judgment on the basis that the noncompetition clause in Hanson’s and Newton’s employment agreements was unenforceable for want of consideration
, and therefore, no valid and enforceable contracts existed subject to interference.  
Id.

SM timely filed a motion for new trial, which was denied by the trial court.  SM then timely filed its notice of appeal.

IV.
  
Summary Judgment

SM’s first seven issues involve the trial court’s granting of partial summary judgment to Hanson and TIG.  Hanson and TIG argue that the trial court’s granting of s
ummary judgment was proper.

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  
Tex. R. Civ. P.
 166a(c); 
Sw. Elec. Power Co. v. Grant, 
73 S.W.3d 211, 215 (Tex. 2002); 
City of Houston v. Clear Creek Basin Auth.
, 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.  
Sw. Elec. Power Co., 
73 S.W.3d at 215.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.
  Valence Operating Co. v. Dorsett
, 164 S.W.3d 656, 661 (Tex. 2005).
  
Evidence that favors the movant’s position will not be considered unless it is uncontroverted.  
Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.
, 391 S.W.2d 41, 47 (Tex. 1965).

The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant’s cause of action or defense as a matter of law.  
Clear Creek Basin
, 589 S.W.2d at 678.

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.
  IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason
,
 
143 S.W.3d 794, 798 (Tex. 2004).
  Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant.  
Centeq Realty, Inc. v. Siegler
, 899 S.W.2d 195, 197 (Tex. 1995).

The function of summary judgment practice is not to deprive a litigant of the right to a jury trial, but to eliminate patently unmeritorious claims and untenable defenses.  
Gulbenkian v. Penn
, 151 Tex. 412, 252 S.W.2d 929, 931 (1952).  Questions of law are appropriate matters for summary judgment.  
Rhone-Poulenc
, 997 S.W.2d at 222.
  
Summary judgment cannot be granted except on the grounds expressly presented in the motion.  
Johnson v. Brewer & Pritchard, P.C., 
73 S.W.3d 193, 204 (Tex. 2002); 
Sci. Spectrum, Inc. v. Martinez,
 941 S.W.2d 910, 912 (Tex. 1997). 

V.  Damages

SM’s issues one through seven first require us to address whether the partial summary judgments can be upheld by this court on the basis of SM’s failure 
to prove damages, even though this is not the articulated reason the trial court granted the partial summary judgments.  The answer from the Texas Supreme Court is “yes.”

We hold that courts of appeals should consider all summary judgment grounds the trial court rules on and the movant preserves for appellate review that are necessary for final disposition of the appeal when reviewing a summary judgment.  
See 
Tex. R. Civ. P. 
90(a)
.  
We further conclude that the appellate court may consider other grounds that the movant preserved for review and trial court did not rule on in the interest of judicial economy. 

Cincinnati Life Ins. Co. v. Cates
, 927 S.W.2d 623, 626 (Tex. 1996); 
see also Baker Hughes, Inc. v. Keco R. & D.
, 
Inc.,
 12 S.W.3d 1, 5 (Tex. 1999); 
Westchester Fire Ins. Co. v. Admiral Ins. Co.
, 152 S.W.3d 172, 178 (Tex. App.—Fort Worth 2004, pet. filed).

The next question is whether SM raised a fact issue on the question of damages.  The classic measure of contract damages is to put the injured party in the same economic position it would have been had the contract been performed.  
See, e.g., Foley v. Parlier
, 68 S.W.3d 870, 884 (Tex. App.—Fort Worth 2002, no pet.).  Furthermore, the measure of actual damages for tortious interference is the same as for breach of contract:  the plaintiff can recover those damages that will put it in the same economic position it would have occupied absent the interference.  
Am. Nat’l Petroleum Co. v. Transcon. Gas Pipe Line Corp
., 798 S.W.2d 274, 278 (Tex. 1990).  A plaintiff seeking to recover for tortious interference with a noncompete agreement must establish proximate causation and damages with evidence rising above mere suspicion or speculation.
  See B. Cantrell Oil Co. v. Hino Gas Sales, Inc
., 756 S.W.2d 781, 784 (Tex. App.—Corpus Christi 1988, no writ),
 superseded by statute on other grounds
. 

SM argues that the income that would have been derived from TIG after Hanson left SM’s employment constituted its damages.  Under the circumstances of this case, that is incorrect.  Had Hanson 
breached his contract with SM by leaving the firm
,
 
such as by an unauthorized resignation before his contract expired, then SM would theoretically be entitled to the income that SM would have generated from his continued employment.  
See Foley
, 68 S.W.3d at 884.   However, SM does not argue that Hanson’s 
departure 
was a breach of the terms of the contract,
(footnote: 6) meaning that this is not the correct measure of damages.  On the contrary, SM argues that Hanson’s postemployment work  for TIG was the breach of contract.  Thus, SM was required to show that Hanson’s postemployment work for TIG somehow caused SM damage, such as by taking clients or business away from SM.  
See B. Cantrell Oil
, 756 S.W.2d at 784 (discussing proximate cause and damages in relation to a noncompete agreement).  This SM did not prove.  

The summary judgment evidence showed that the work performed by Hanson was associated with his personal knowledge based on his prior experience at TIG and had nothing to do with his employment at SM.  In other words, once he properly left TIG, he could work for anyone as long as it did not damage SM.  Hence, this work did not damage SM because he was not taking away business from SM; rather, TIG hired Hanson for his personal experience, whether Hanson had worked at SM or not.  Specifically, SM never made any proposal to do work for TIG after Hanson’s departure because SM had aggressively and unsuccessfully pitched their services to TIG during Hanson’s tenure.  Further, SM did not prove that it had lost customers of significance that it could attribute to Hanson, and TIG showed that it would not have hired an outside consulting firm, such as SM, to do the work performed by Hanson. Moreover, SM failed to provide any competent evidence of any damages on account of Hanson’s alleged interference with Newton’s contract.  Therefore, SM has failed to establish proximate causation and damages in relation to the noncompete agreement.  
See id.
   

Because SM failed to raise a fact issue as to damages for its first seven issues, the trial court’s granting of summary judgment on those claims was appropriate.  Therefore, we need not assess whether the noncompete agreement is enforceable or whether Hanson waived the requirements of the covenants not to compete act.  We overrule SM’s issues one through seven. 

VI.  The Jury Verdict

In its eighth and ninth issues SM complains that the jury verdict in favor of Hanson on its cause of action for breach of fiduciary duty was against the great weight and preponderance of the evidence or the evidence was legally and factually insufficient to support the jury’s verdict.
(footnote: 7)
 A. Burden of Proof on the Breach of Fiduciary Duty Claim

SM contends that Hanson, while an officer and fiduciary of SM, breached his fiduciary duty by usurping a corporate opportunity.  Moreover, SM argues that even if there is no evidence other than the existence of a fiduciary duty and the occurrence of a transaction by the fiduciary, SM must prevail.  We disagree.

To establish a breach of a fiduciary duty by usurping a corporate opportunity, the corporation must prove that an officer or director misappropriated a business opportunity that properly belongs to the corporation. 
Int’l Bankers Life Ins. Co. v. Holloway,
 368 S.W.2d 567, 576–78 (Tex. 1963), 
superseded by statute on other grounds
; 
Alexander v. Sturkie,
 909 S.W.2d 166, 169 (Tex. App.—Houston [14th Dist.] 1995, writ denied).  The business opportunity arises where a corporation has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity.  
Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.,
 
779 S.W.2d 474, 477 (Tex. App.—El Paso 1989, writ denied).

SM was required prove that Hanson 
misappropriated 
a business opportunity that belonged to SM to establish its breach of fiduciary duty claim
.  
See 
Int’l Bankers,
 368 S.W.2d at 576–78; 
Alexander,
 909 S.W.2d at 169.  Thus, the mere showing that Hanson was a fiduciary and that there was a transaction by Hanson is not enough.  
As detailed above, the work performed by Hanson for TIG was based upon his personal knowledge and prior experience at TIG and had nothing to do with his employment at SM.
(footnote: 8)  Because the work was personal to Hanson and because Hanson’s departure from SM was not a breach of contract, SM had no 
expectancy in
 the work performed by Hanson for TIG.  
Dyer,
 
779 S.W.2d at 477.  Furthermore, SM was unsuccessful in its attempts to gain TIG’s business during Hanson’s tenure at SM and made no proposals to do work for TIG after Hanson’s depa
rture.  
Therefore, SM failed to prove that Hanson misappropriated a business opportunity that properly belonged to SM.  
Int’l Bankers,
 368 S.W.2d at 576–78; 
Alexander,
 909 S.W.2d at 169.  

B. Great Weight and Preponderance and Legal Sufficiency of the Evidence

In reviewing an issue asserting that a finding is “against the great weight and preponderance” of the evidence, we must consider and weigh all of the evidence and set aside the finding only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.  
Dow Chem. Co. v. Francis
, 46 S.W.3d 237, 242 (Tex. 2001); 
In re King's Estate
, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).  
Generally, we do not have to detail supporting evidence when upholding factual sufficiency of the evidence underlying the trial court's judgment.  
Ellis County State Bank v. Keever
, 888 S.W.2d 790, 794 (Tex. 1994).
 

A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact (3) the evidence offered to prove a vital fact is no more than a mere scintilla or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
"No Evidence"
 
and "Insufficient Evidence" Points of Error
, 38 T
EX
. L. R
EV
. 361, 362–63 (1960)
.  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could, and disregard evidence contrary to the finding unless a reasonable fact-finder could not.
  
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005). 

Here, the evidence showed that Hanson performed work for TIG after his tenure with SM had concluded.  The work Hanson did for TIG consisted of specific litigation testimony related to Hanson’s specialized factual knowledge of TIG’s contracts.  At trial, SM conceded that it could not give a deposition as a fact witness for TIG.  Thus, the work Hanson performed was not work that SM could have performed.  Other than these specific litigation needs, TIG never contacted Hanson about any other work, including missed reinsurance work.  Based upon its verdict, the jury reasonably found these specific fact-based assignments were unique to Hanson and did not constitute SM’s corporate opportunities.   

We hold that the trial court’s judgment that Hanson did not breach his fiduciary duty was supported by legally sufficient evidence and was not contrary to the great weight and preponderance of the evidence.  We overrule SM’s eighth and ninth issues.

VII. Conclusion

Having overruled SM’s nine issues, we affirm the judgment of the trial court.  

BOB MCCOY

JUSTICE

PANEL A: LIVINGSTON, WALKER, and MCCOY, JJ.

DELIVERED: November 30, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
The agreement defined a “covered customer” as any entity or person who engaged in or contemplated engaging in business with SM in the last thirty months of Hanson’s employment and from who SM received “protected information” or with whom Hanson had contact.

3:
Scruggs submitted an affidavit disputing this point.

4:
The calculation consists of 2,857 hours billed by Hanson ($500,000/$175 per hour=2,857 hours) x $125 per hour reserved to SM=$357,142 in net income for post-termination services provided by Hanson to TIG.

5:
Newton was also an employee of SM.  Hanson and Newton coauthored a joint resignation letter to SM.

6:
In fact SM “terminated” 
Hanson’s employment October 8, 2001.

7:
When the party having the burden of proof on a fact finding appeals from an adverse fact finding, the issue or point challenging the factual sufficiency of the evidence should be that the finding was “against the great weight and preponderance of the evidence.”  
Croucher v. Croucher,
 660 S.W.2d 55, 58 (Tex. 1983).

Nonetheless, because the Texas Supreme Court’s practice is to liberally construe the issues or points contained in appellate briefs, an inappropriately phrased point should be construed as raising a challenge to the factual sufficiency of the evidence where the error is “readily apparent from the argument briefed.”  
Pool v. Ford Motor Co.
, 715 S.W.2d 629, 633 (Tex. 1986) (op. on reh'g); 
see
 
Tex. R. App. P. 
38.1(e).

8:
Scruggs did testify that SM could do any of the work performed by Hanson after he left SM.  However, the jury is the sole judge of credibility of the witnesses and the weight of their testimony and had the right to disregard Scruggs’s testimony.  
See, e.g.,
 
State Indus., Inc. v. Corbitt
, 925 S.W.2d 304, 310 (Tex. App.—Houston [1st
 Dist.] 1996, no writ).